PILLSBURY WINTHROP SHAW PITTMAN LLP
ROBERT L. WALLAN (SBN 126480)
robert.wallan@pillsburylaw.com
REBECCA TIERNEY (SBN 274283)
rebecca.tierney@pillsburylaw.com
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:      213.488.7100
Facsimile:       213.629.1033

Attorneys for Plaintiff IN-N-OUT BURGERS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN-N-OUT BURGERS, a California corporation,<br><br>        Plaintiff,<br><br>        vs.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>        Defendant. | Case No. 8:20-cv-01000-KES<br><br>**FIRST AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff In-N-Out Burgers ("Plaintiff" or "In-N-Out") complains against defendant Zurich American Insurance Company ("Zurich") as follows:

**I.     NATURE OF THE ACTION**

1.     This action arises out of Zurich's denial of coverage under an "all-risk" insurance policy for business interruption losses. The "all-risk" policy drafted by Zurich expressly <u>includes</u> coverage for many types of contamination, including radiation, ammonia, virus, pathogen or pathogenic organism, and disease-causing illness or agent. In-N-Out submitted a claim for business interruption and other covered losses arising in connection with the novel coronavirus and ongoing COVID-19 pandemic, but Zurich denied coverage without conducting any investigation.

2.     In-N-Out seeks damages for breach of contract against Zurich for its failure to honor its policy obligations.  In-N-Out further seeks a judgment declaring

the scope of Zurich's obligation to pay In-N-Out's losses under The Zurich Edge™ commercial property insurance policy sold to In-N-Out. In-N-Out further seeks damages incurred by reason of Zurich's breach of the covenant of good faith and fair dealing.

## II. PARTIES

3. In-N-Out is a California corporation with its principal place of business in Irvine, California. In-N-Out is a well-known and successful chain of quick-service restaurants specializing in award-winning hamburger and cheeseburger sandwiches.

4. In-N-Out is informed and believes, and based thereon alleges, that Zurich is a New York corporation with its principal place of business at 1299 Zurich Way, Schaumburg, IL 60196.

## III. JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because In-N-Out and Zurich are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. §1391(2) as a substantial amount or part of the events or omissions giving rise to the claim occurred in this district.

## IV. FACTUAL BACKGROUND

### A. In-N-Out

7. For over 70 years, In-N-Out has operated a highly recognizable and successful chain of quick-service restaurants specializing in the highest quality hamburger and cheeseburger sandwiches and other products and services.

8. It currently operates approximately 350 locations predominantly in California, and also in Arizona, Nevada, Utah, Oregon and Texas.

9. Celebrated for its fresh food and other high standards of quality, In-N-Out consistently rates with the press as the top quick service restaurant in customer satisfaction surveys.

10. In-N-Out's commitment to its associates has resulted in recognition as one of the best places in the country to work. This year, Glass Door recognized In-N-Out as number four on its list of best places to work in the United States, ahead of Google, Southwest Airlines, John Deere, and many other highly regarded companies across all of American industry.

11. In-N-Out is known for its drive-through operations, but the vast majority of all In-N-Out locations have dining rooms and outdoor eating areas where customers walk up and place orders inside the restaurants, choosing to either dine at the restaurant or take their food to go.

12. As a part of its prudent business practices, In-N-Out maintains insurance coverage. In-N-Out specifically maintains "all risk" coverage with Zurich, covering not only more commonly known risks like fire, but also entirely unknown and novel risks that may arise which were not previously considered by the Company, Zurich or by the public at large. As described below in greater detail, the Zurich policy at issue here provides coverage for "*all risks of direct physical loss of or damage from any cause unless excluded.*" And the Zurich policy at issue here contains no exclusion for viruses or infectious diseases.

**B. The COVID-19 Pandemic**

13. COVID-19 is an infectious disease caused by a virus, known as the "novel coronavirus" or SARS-CoV-2. It is believed that the first instance of the disease spreading to humans was in or around December 2019.

14. In January 2020, this virus and its resulting disease COVID-19 reached the United States and quickly spread across the country. As early as February 26, 2020, the Center for Disease Control and Prevention ("CDC") advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission.

15. On March 11, 2020, the World Health Organization ("WHO") declared COVID-19 to be a pandemic.

16. COVID-19 is highly contagious, uniquely resilient, and deadly.

17. The WHO states "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks…People can catch COVID-19 if they breathe in these droplets from a person infected with the virus… These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[1]

18. In the April 16, 2020 edition of the *New England Journal of Medicine*, researchers from UCLA, Princeton University, the National Institute of Allergy and Infectious Diseases and the Centers for Disease Control and Prevention reported a scientific study comparing the Aerosol and Surface Stability of SARS-CoV-2 (novel coronavirus) to an earlier coronavirus, SARS-CoV-1. The study reports that the novel coronavirus persisted in their tests up to 72 hours on plastic and stainless steel.

19. A CDC posting from March 27, 2020 reported that SARS-CoV-2 was identified on surfaces of the cabins on board the Diamond Princess cruise ship 17 days after the cabins were vacated but before they were disinfected. Numerous other scientific studies and articles have identified the persistence of coronavirus on doorknobs, toilets, faucets and other high touch points.

20. In a March 4, 2020 research letter published by the *Journal of the American Medical Association,* scientists from the National Centre for Infectious Disease and the DSO National Laboratories, both in Singapore, found novel coronavirus in the majority of uncleaned hospital rooms that had previously been occupied by patients infected with COVID-19. The researchers concluded that "SARS-CoV-2 through respiratory droplets and fecal shedding suggests the

---

[1] "How does COVID-19 spread?," World Health Organization (last checked May 19, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answersZurich -hub/q-a-detail/q-a-coronaviruses

-4-

environment as a potential medium of transmission and supports the need for strict adherence to environmental and hand hygiene."

21. Via its corporate web pages, Zurich has admitted to the physical dangers associated with the novel coronavirus, advising its customers to rely on the same scientific studies by the New England Journal of Medicine, The Centers for Disease Control, and other such sources concerning how long the virus survives on surfaces and touch points like door handles and counters. Zurich has underscored the need to repeatedly disinfect these surfaces. *See, e.g.,* https://www.zurichna.com/knowledge/articles/2020/05/disinfecting-offices-and-facilities-during-the-covid-19-crisis (last checked May 27, 2020).

22. A particular challenge with the novel coronavirus is that it is possible for a person to be infected with COVID-19, but be asymptomatic. Such seemingly healthy people unknowingly spread the virus via speaking, breathing, and touching objects.

23. While infected droplets and particles carrying COVID-19 may not be visible to the naked eye, they are physical objects which travel to other objects and cause harm. Habitable surfaces on which COVID-19 has been shown to survive include, but are not limited to, stainless steel, plastic, wood, paper, glass, ceramic, cardboard, and cloth.

24. At present, testing protocol and reporting faces significant challenges. It was widely reported in late May that the CDC has mixed up test data from individuals testing positive for the virus with individuals showing the presence of antibodies produced in response to the virus. Testing remains limited, and the accuracy of the tests are in doubt. The Food and Drug Administration reported in May that the Abbot ID NOW test used within the White House produces unreliable results.

25. At present, based on testing of only a very small proportion of the population, roughly 1.6 million people are confirmed to have been or are infected throughout the United States, resulting in over 110,000 deaths as of early June, 2020.

In California, also based on limited testing, more than 130,000 cases have been confirmed.

26.     The CDC keeps track of known infections by county.  Virtually every county where an In-N-Out restaurant is located has reported COVID-19 infections. Within the Company, In-N-Out has been informed that to date, more than 30 of its associates have been diagnosed with COVID-19.

**C.     Government Orders and the Closure of In-N-Out Restaurants**

27.     On March 16, 2020, the CDC and the national Coronavirus Task Force issued to the American public guidance titled "30 Days to Slow the Spread" of COVID-19. The guidance called for extreme social distancing measures, such as working from home, avoiding gatherings of more than 10 people, and staying away from bars and restaurants.

28.     State governments across the nation recognized the unprecedented and catastrophic situation, with California, Arizona, Nevada, Utah, Oregon and Texas making "State of Emergency" declarations in early March.  Within a short time, these states issued orders suspending or severely limiting business operations of non-essential businesses where people could potentially contract COVID-19 from others or the property itself.  This included closing restaurant dining rooms.

29.     Simultaneously or shortly thereafter, states across the country issued orders encouraging or requiring citizens to "shelter in place" or "stay at home."

30.     In many instances, city and county governments issued their own restrictive orders, which among other things closed restaurant dining rooms.

31.     On March 19, 2020, the City of Los Angeles issued its "Safer at Home" order "because, among other reasons, the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time."[2]

---

[2] Public Order Under City of Los Angeles Emergency Authority, Issue Date March 19, 2020. (last checked May 19, 2020)

1     32. On March 31, 2020, Dallas County, Texas issued an order stating that "the COVID-19 virus causes property loss or damage due to its ability to attach to surfaces for prolonged periods of time…"[3]

    33. On March 17, 2020, Orange County issued its "Order of the Local Health Officer" prohibiting "all public and private gatherings of any number of people occurring outside a single household" and ordering that "all restaurants and other establishments that serve food shall close all on-site dining consistent with guidance provided by the California Department of Public Health…"[4]

    34. On March 27, 2020, San Diego County issued its "Order of the Health Officer and Emergency Regulations" ordering all restaurants to close their dining rooms. The order also required essential service providers to follow a strict social distancing and sanitation protocol. The protocol requires the following mandatory procedures: "Disinfecting wipes that are effective against COVID-19 are available near shopping carts and shipping baskets; Employee(s) assigned to disinfect carts and baskets regularly; Hand sanitizer, soap, and water, or effective disinfectant is available to the public at or near the entrance of the facility, at checkout counters, and anywhere else inside the store or immediately outside where people have direct interactions; Disinfecting all payment portals, pens, and styluses after each use; [and] Disinfecting all high-contact surfaces frequently."[5]

---

https://www.lamayor.org/sites/g/files/wph446/f/page/file/20200513%20Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20%28REV3%202020.05.13%29X.pdf

[3] Amended Order of County Judge Clay Jenkins, Issue date March 31, 2020. (last checked May 19 ,2020) https://www.dallascounty.org/Assets/uploads/docs/covid-19/orders-media/033120-DallasCountyOrder.pdf

[4] Order of the Local Health Officer. Issue Date March 17, 2020. (last checked May 22, 2020) https://cms.ocgov.com/civicax/filebank/blobdload.aspx?BlobID=114362&fbclid=IwAR1DksYgc1FkbpPnypqiHK8pNYojOnKaviWFjd6FIbqYVM8MsRxsMm9YoFw

[5] "Order of the Health Officer and Emergency Regulations" issued March 17, 2020 and updated May 21, 2020. (last checked May 22, 2020) https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/HealthOfficerOrderCOVID19.pdf

35. On March 16, 2020, the City and County of San Francisco issued its shelter in place "Order of the Health Officer No. C19-07" stating:

> The virus that causes Coronavirus 2019 Disease ("COVID-19") is easily transmitted, especially in group settings, and it is essential that the spread of the virus be slowed to protect the ability of public and private health care providers to handle the influx of new patients and safeguard public health and safety. Because of the risk of the rapid spread of the virus, and the need to protect all members of the community and the Bay Area region, especially including our members most vulnerable to the virus and also health care providers, this Order requires all individuals anywhere in San Francisco to shelter in place—that is, stay at home…

It further orders that all "[r]estaurants and cafes—regardless of their seating capacity—that serve food are ordered closed except solely for takeout and delivery service."[6]

36. The counties of Santa Clara, San Mateo, Marin, Contra Costa, and Alameda issued near identical orders. On March 31, 2020, the City and County of San Francisco updated its order as follows:

> It is now well established that the virus that causes Novel Coronavirus 2019 Disease ("COVID-19") is easily transmitted, especially in group settings, and that the disease can be extremely serious. It can require long hospital stays, and in some instances cause long-term health consequences or death. It can impact not only those known to be at high risk but also other people, regardless of age. This is a global pandemic causing untold societal, social, and economic harm. To mitigate the harm from the pandemic, on March, 16, 2020, the City and County of San Francisco, along with a group of five other Bay Area counties and the City of Berkeley, issued parallel health officer orders imposing shelter in

---

*See also* "Social Distancing and Sanitation Protocol" issued May 21, 2020. (last checked May 22, 2020) https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/SOCIAL_DISTANCING_AND_SANITATION_PROTOCOL_04022020_V1.pdf

[6] "Order of the Health Officer No. C19-07" issued March 16, 2020. (last checked May 22, 2020). https://www.sfdph.org/dph/alerts/files/HealthOrderC19-07-%20Shelter-in-Place.pdf

-8-

place limitations across the Bay Area, requiring everyone to stay safe at home except for certain essential needs. Other jurisdictions in the Bay Area and ultimately the State have since joined in adopting stay safe at home orders.[7]

37. On March 17, 2020, Mayor Kate Gallego of Phoenix, issued the following proclamation "Based on input from healthcare professionals, business leaders,& community members, PHX is declaring a state of emergency forcing immediate closure of bars & moving restaurants to delivery/take-out/drive-thru only starting 8PM tonight."[8]

38. On March 17, 2020, the City of Tucson issued its "Proclamation of the Mayor Declaring an Emergency or Local Emergency" stating:

> Whereas, in the last several days, the Mayors of various Arizona cities and towns, including Flagstaff, Yuma, Prescott Valley, Gilvert and others have issued proclamations declaring a local emergency in connection with the COVID-19 outbreak;…and whereas, emergency management measures are required to reduce the severity of the local emergency and mitigate the spread of COVID-19; and to protect the health, safety and welfare of the people and property located in the City of Tucson…
>
> It is proclaimed and ordered, effective immediately…to protect life and/or property and to promote public safety and welfare…all restaurants, food courts, cafes, coffeehouses, retail food facilities, and other similar business and establishes are prohibited from serving food and beverages for consumption on the premises.[9]

39. On March 29, 2020, Salt Lake County issued a "Public Health Order" ordering "[d]ine-in food service, whether inside or outside the establishment is prohibited." The order further instructed essential businesses to practice enhanced sanitation as follows:

---

[7] "Order of the Health Officer No. C19-07b" issued March 31, 2020. (last checked May 22, 2020). https://www.sfdph.org/dph/alerts/files/HealthOfficerOrder-C19-07b-ShelterInPlace-03312020.pdf
[8] https://twitter.com/MayorGallego/status/1240001629073469440
[9] "Proclamation of the Mayor Declaring an Emergency or Local Emergency" issued March 17, 2020. (last check May 22, 2020). https://www.tucsonaz.gov/files/PROCLAMATION.pdf

-9-

> Reinforcing key messages to all employees, including staying home when sick, using appropriate cough and sneezing etiquette, and practicing appropriate handwashing…Performing frequent and enhanced environmental cleaning of commonly touched surfaces, such as workstations, countertops, railings, door handles, and doorknobs…Businesses that must accept cash, checks, or credit cards shall use cleansing measures between transactions, including any best practices issued by the Health Department. Cash transactions are discouraged, but not prohibited…Having hand sanitizer and/or sanitizing products readily available for employees and customers.[10]

40. Government orders applicable across all of In-N-Out's locations have ordered that all restaurant dining rooms be closed.

41. As a result of the COVID-19 pandemic, the property damage caused by the novel coronavirus, and in compliance with government guidance and orders, In-N-Out was forced to close all of its restaurant dining rooms. Based on the phased reopening being permitted by numerous government agencies, it appears highly likely that the reopening of dining rooms will be allowed only in a phased approach that may vary by specific jurisdiction. In-N-Out has suffered and continues to suffer significant losses from the closures of its dining rooms and related losses from the COVID-19 pandemic.

**D.    The Zurich Edge™ "All Risk" Commercial Property Policy**

42. In exchange for a very substantial premium, Zurich sold In-N-Out policy number MLP9137890-13, effective from June 1, 2019 to June 1, 2020. The policy provides coverage for property losses, for business interruption losses ("Time Element" per the policy language), and other losses. The policy limit is $250 million, which is subject to deductibles, sublimits, and other conditions described in relevant part below.

---

[10] "Public Health Order" issued March 29, 2020.  (last checked May 22, 2020). https://slco.org/globalassets/1-site-files/health/programs/covid/pho/pho3.pdf

-10-

43. The policy contains sublimits for many losses, but other losses are simply subject to the full $250 million policy limit. For example, the policy has no sublimit for Time Element (business interruption) meaning the full $250 million in coverage is available. As other examples, the policy limits coverage to $75 million for earth movement, $2 million for fine arts, $5 million per location for Contingent Time Element, and $1 million for losses from ammonia contamination. The policy also contains some time limits on coverage. For example, coverage for gross earnings (part of Time Element) is limited to 24 months. Civil or Military Authority is limited $2.5 million per property and a 90-day time frame.

44. The insuring clause in the 162-page policy provides in relevant part that the policy "[i]nsures against direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property, at an Insured Location. . ." The term "**Covered Cause of Loss**" is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."

45. In several distinct ways, the policy explicitly recognizes that contamination of property constitutes "direct physical loss of or damage" to property:

(a) First, the policy contains a sublimit of $1 million for ammonia contamination.

(b) Second, the policy extends coverage to radioactive contamination.

(c) Third, the policy contains an exclusion removing certain types of contamination from coverage while leaving other types of contamination as covered. In the base policy form, Zurich defined "Contamination" to include "pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent. . ." The base policy form also defined "Contaminant" to include ammonia. But through an endorsement that was issued at the inception of coverage, the terms "contamination" and "contaminant" were redefined in relevant part to delete pathogen or pathogenic organism, bacteria, virus and disease-causing illness or agent and ammonia from the exclusion.

46. As noted above, Zurich deleted the exclusion for ammonia contamination, and applied a $1 million sublimit to that loss only. With respect to pathogen or pathogenic organism, bacteria, virus and disease-causing illness or agent, the policy does not apply a sublimit, meaning the entire $250 million limit is available.

47. The policy covers In-N-Out's Time Element losses up to $250 million, subject to the applicable deductible, based on the novel coronavirus and direct physical loss of or damage to property.

48. The novel coronavirus has caused "direct physical loss of or damage to" In-N-Out property insured under the policy.

49. The policy contains deductibles of $200,000 for Time Element per occurrence. The policy contains a deductible of $200,000 for Contingent Time Element per location. The policy contains other deductibles for specific properties and circumstances.

50. The policy contains a section entitled "Time Element Coverages" which insures In-N-Out's gross earnings. Within that section, coverage is extended for "Extra Expense" which covers the cost to resume normal business operations with a $10 million limit.

51. The policy also contains what are described as "Special Coverages." These include items such as "Civil or Military Authority," "Contingent Time Element," "Decontamination Costs," "Ingress/Egress," and many others.

52. "Civil or Military Authority" coverage insures the Time Element Loss (gross earnings) resulting from "the necessary **Suspension** of the **Insured's** business activities at an Insured Location if the Suspension is caused by order of civil or military authority that prohibits access to the Location. That order must result from a civil authority's response to direct physical loss of or damage caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the insured" and within one mile of an insured location. As alleged above, state and local governments

-12-

issued orders closing In-N-Out's dining rooms in order to control spread of the virus and specifically because the virus is causing property loss or damage everywhere, including many places within one mile of In-N-Out locations. As a result of those civil orders, In-N-Out has suffered loss insured under the policy.

53. "Contingent Time Element" coverage covers the gross earning loss "directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from the direct physical loss of or damage caused by [any non-excluded cause] to Property . . . at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and **Attraction Properties** located worldwide . . . ." Attraction Properties are defined as properties that attract customers to the insured's business. In plain English, the policy provides coverage for In-N-Out's losses if certain types of neighboring properties suffer property loss or damage of the type not excluded under the policy. For example, In-N-Out operates stores near numerous universities and is highly popular with students. The closure of classes at UCLA, UC Irvine and elsewhere by reason of the coronavirus has resulted in covered loss of business for In-N-Out.

54. "Decontamination Costs" are covered to the sublimit where a law or ordinance regulating contamination results in increased cost of decontamination.

55. The insuring clause covers "loss of or damage to property," with the word "or" signifying that those are two different concepts. There is no requirement that the loss of property be permanent or complete. Here, In-N-Out is suffering both a "loss of" its dining rooms, *and* property damage based on the scientific studies quoted above.

56. Beginning with its introduction in 2008, Zurich marketed its Edge policy form as offering uniquely "broader coverage and greater flexibility." Zurich's CEO made this announcement and lauded the clarity of the form. Zurich knew it was selling an insurance product that did not exclude loss from virus, which is demonstrated by its regulatory filings. In December of 2019, just before the novel coronavirus was

-13-

discovered, Zurich filed a regulatory request to modify its policy language. Buried in the edits, and without reference to the significance of the change, Zurich's filing sought to add back an exclusion for virus, which it sought to have take effect in July 2020.

### E.     In-N-Out's Losses

57.    A large percentage of In-N-Out's business derives from on-site dining in its dining rooms and via walk-up sales for its outside eating areas. Since mid-March, those dining rooms have been closed resulting in a substantial Time Element loss of the Company's "gross earnings" as insured under the policy.

58.    In-N-Out has incurred and will incur "Decontamination Costs" under the policy.

59.    While potentially and at least partially overlapping with its Time Element Loss, the gross earnings loss as covered under the policy is also resulting as Contingent Time Element Loss given the closure of nearby properties, and Civil Authority loss as a result of Civil Orders as alleged above.

60.    As the nation works to determine a path forward to reopening business, In-N-Out expects that it will incur Extra Expense as insured under the policy. In-N-Out also expects that with the calculation of its full losses when better known, additional coverages under the policy may be applicable.

### F.     Zurich's Denial of Claim

61.    On or about April 20, 2020, In-N-Out gave notice to Zurich of its coronavirus loss. Zurich responded with a short email containing a handful of questions regarding COVID-19 diagnoses and the amount of loss, to which In-N-Out responded.

62.    Within one week of receiving notice, a senior Zurich employee informed In-N-Out that he believed Zurich would not cover the loss. Instead, Zurich announced to the world press that it denies there is coverage for virtually all business interruption losses arising from the novel coronavirus. On or about May 14, 2020, Zurich's CFO

1  George Quinn announced Zurich's position that virtually all (more than 99%) of its
2  policies in the United States exclude losses for virus (even though its broadly
3  marketed Edge form does not exclude virus losses). He further claimed that Zurich's
4  worldwide business interruption claims due to COVID-19 would be about $450
5  million (60% of $750 million) in 2020, with the bulk of those claims payments being
6  in Europe. https://www.zurich.com/en/media/news-releases/2020/2020-0514-01 ,
7  https://www.insurancejournal.com/news/international/2020/05/14/568567.htm (both
8  last checked May 28, 2020).

9       63.    On May 29, 2020, a claims representative from Zurich telephoned In-N-
10 Out and said that Zurich was denying the claim. She said a written letter would be
11 forthcoming, but that Zurich took the position that the policy excludes loss relating to
12 virus despite the plain policy language to the contrary.

13      64.    On June 1, 2020, In-N-Out received two letters. The first letter was sent
14 via certified mail and was dated May 21. It states that it was sent by email, but it was
15 not received by email, and indeed Zurich had been misdirecting other email. The May
16 21 letter only asked for three pieces of information, all of which Zurich already had.
17 For example, Zurich asked for copies of the publicly available government orders
18 issued in response to the pandemic. The May 21 letter (received June 1) confirmed
19 that Zurich would be conducting an investigation.

20      65.    Also on June 1, In-N-Out received a letter dated May 29 from Zurich
21 confirming the verbal denial of the claim. The May 29 letter asserted two bases for the
22 denial. First, Zurich argued with no analysis and contrary to the express policy
23 language that loss relating to virus was excluded. Zurich summarily argued that the
24 endorsement deleting "virus" as excluded loss could not apply based on the title of the
25 endorsement, even though the policy explicitly requires that endorsement titles be
26 ignored. Second, while misquoting the policy, Zurich made a one-sentence assertion,
27 again with no analysis, no support and no investigation, that the novel coronavirus
28 does not cause loss of use of or property damage. In doing so, Zurich directly

-15-

contradicted its own website postings.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Breach of Contract)

66. In-N-Out incorporates the above Paragraphs 1-45 by reference.

67. In-N-Out paid for the policy and otherwise performed all of its obligations owed under that policy or was excused from performance. In denying coverage for In-N-Out's insurance claim as alleged above, Zurich breached the contract. As a result, In-N-Out has suffered and continues to suffer damage in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF

### (Declaratory Relief)

68. Plaintiff incorporates the above Paragraphs by reference.

69. An actual controversy exists between the parties within the meaning of California Code of Civil Procedure Section 1060.

70. As such, this Court has the authority to issue a declaratory judgment concerning the respective rights and duties of In-N-Out and Zurich under the policy.

71. In-N-Out is entitled the declaratory relief establishing that the losses it has suffered are covered by Policy.

### THIRD CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing)

72. Plaintiff incorporates the above Paragraphs by reference.

73. An implied covenant of good fair and fair dealing arose as a result of Zurich's issuance of the policy to In-N-Out. Zurich's duty of good faith and fair dealing obligated Zurich to consider In-N-Out's interests *at least* equal to its own interests; to fully advise In-N-Out of all of its rights under the policy and under the law with regards to claims arising thereunder; to acknowledge and act reasonably promptly with respect to claims arising under the policy; to adopt and implement

reasonable standards for the prompt investigation and processing of claims under the policy; to promptly affirm or deny coverage of claims within a reasonable period of time after presentation of a claim; and to avoid unreasonably withholding or delating payment of any benefits owed under the policy.

74. Zurich breached its implied covenant of good faith and fair dealing owed to In-N-Out by, among other things, engaging in the following:

(a) Knowingly and intentionally failing to promptly and thoroughly investigate all possible bases to support In-N-Out's claim for coverage under the policy, including a complete failure to demonstrate that it read or considered the actual policy language; promising an investigation but then denying coverage before any such investigation; ignoring its own website postings confirming how the novel coronavirus lives for days on surfaces including the steel and plastic surfaces commonly found in restaurants;

(b) Intentionally placing Zurich's interest in saving money ahead of its insured's interests in obtaining benefits which it is rightfully entitled to under the policy;

(c) Misrepresenting the terms of coverage in that Zurich submitted a request to regulators to add an exclusion for virus back into the Edge policy form in December, 2019, only a matter of months before denying a claim on the grounds that there was a virus exclusion in effect;

(d) Wrongfully denying In-N-Out's coverage forcing In-N-Out to file this litigation in order to obtain the coverage it is entitled to.

## VI. PRAYER FOR RELIEF

WHEREFORE, In-N-Out prays for judgment as follows:

1. On the First Claim for Relief for Breach of Contract:

   (a) For damages in an amount up to the policy limit less a proper deductible;

   (b) For costs of suit; and

1         (c)    Interest at the maximum legal rate on all amounts owed under the Policy, accruing from the date upon which amounts should have been paid.

2.   On the Second Claim for Declaratory Relief:

    (a)    That this Court declare the rights, obligations and liabilities of the parties herein and specifically declare, as In-N-Out contends, that the events and losses incurred as described in this complaint are covered by the policy.

3.   On the Third Claim for Relief for Breach of the Covenant of Good Faith and Fair Dealing:

    (a)    For damages according to proof;

    (b)    For attorneys' fees and costs incurred in establishing benefits owed to In-N-Out under the policy

4.   On all claims for relief:

    (a)    For costs of suit incurred herein; and

    (b)    For such other relief as the Court may deem just and proper.

Dated:  June 9, 2020

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: */s/ Robert L. Wallan*
      Robert L. Wallan
      Rebecca Tierney
      Attorneys for Plaintiff
      IN-N-OUT BURGERS